******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* RICHARD CANTILLON ET AL.
## (SC 20655)

Robinson, C. J., and McDonald, D'Auria,
Mullins and Ecker, Js.

*Syllabus*

The complainant, H, filed a complaint with the plaintiff, the Commission on Human Rights and Opportunities, alleging housing discrimination on the basis of race against the defendant C, her neighbor in a condominium complex, who tormented H by repeatedly making obscene gestures, directing vile, racial epithets toward her, and threatening her. C was defaulted in the underlying administrative proceeding, and, following a hearing in damages, the human rights referee found that H had suffered emotional distress and awarded her $15,000 in damages. The commission, viewing the award as insufficient, appealed to the Superior Court, claiming that, under *Patino* v. *Birken Mfg. Co.* (304 Conn. 679), an award for garden-variety emotional distress damages presumptively must be at least $30,000, and that the referee made various errors of law in assessing the heinousness of C's conduct pursuant to the test that the commission adopted in its prior decision in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco* (*Harrison*). The trial court, recognizing that it was bound by the highly deferential standard of review that governs administrative decisions, concluded that there was no legal basis for it to second-guess the award, and it rendered judgment dismissing the appeal. The Appellate Court affirmed the trial court's judgment, concluding that *Patino* did not adopt any presumptive floor for emotional distress damages and that the referee's heavily fact-specific assessment of H's emotional distress damages was not an abuse of discretion. On the granting of certification, the commission appealed to this court. *Held*:

1. There was no merit to the commission's claim that the referee's award of $15,000 in damages violated *Patino*, an employment discrimination case in which this court upheld a jury award of more than $90,000 in noneconomic damages for garden-variety emotional distress:

   In *Patino*, the court cited to a series of cases in which awards of $100,000 or more had been made in civil rights cases and quoted a federal district court case in support of the proposition that garden-variety emotional distress claims "generally merit $30,000 to $125,000 awards," and the commission claimed, for purposes of the present case, that *Patino* therefore established that range for garden-variety emotional distress claims.

   This court clarified that its intent in *Patino* was to note that an award of damages that was squarely within the range of those awards that often are made in nearby jurisdictions will not shock the judicial conscience, and the court in *Patino* did not intend to use the range of damages referenced therein to establish the inverse rule, namely, that an award lower than the generally prevailing range of damages in federal jury trials is presumptively an abuse of discretion in Connecticut.

   This court further clarified that the quote from the federal district court case on which *Patino* relied was misleading insofar as that federal case and its progeny acknowledged that the range of awards in the Second Circuit is much wider than $30,000 to $125,000, in both directions.

   Moreover, confining emotional distress damages to some permissible range would run afoul of decades of Connecticut jurisprudence, insofar as this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages.

   Furthermore, the commission did not identify any other area of the

law in which Connecticut courts have taken the extraordinary step of establishing any limit on the amount of damages that presumptively can be awarded by a Connecticut jury, court, or administrative agency, and it would be inappropriate for courts to do so insofar as the determination of whether to establish some minimum or maximum permissible award for any particular cause of action, in light of evolving public sentiments and the conflicting societal interests involved, is a quintessentially legislative, rather than judicial, function, especially when that determination involves an administrative agency.

Notwithstanding the commission's claim to the contrary, the lack of a floor on emotional distress damages awards that is consistent with the lower end of the prevailing range of awards in the Second Circuit would not create a forum shopping issue, as there was no evidence that complainants have been engaging in such forum shopping, and, even if federal jury awards were in the range that *Patino* quoted, there are many other differences between pursuing an administrative complaint before the commission and litigating a civil action in federal court that might make one venue or the other more advantageous for a particular complainant.

2. The commission could not prevail on its claim that the referee incorrectly applied and expanded the three factor test that the commission adopted in *Harrison* for calculating emotional distress damages, and the Appellate Court correctly determined that the referee invoked the applicable legal standard, that her application of that standard did not represent an abuse of discretion, and that her factual findings were not clearly erroneous:

*Harrison* recognized that the first and most important factor in calculating emotional distress damages is the subjective internal emotional reaction of the complainant to the discriminatory experience that he or she had undergone, and whether the reaction was intense, prolonged, and understandable, the second factor is whether the discrimination occurred in public, and the third factor is the degree of the offensiveness of the discrimination and the impact on the complainant.

The referee in the present case found that the first factor warranted some award of emotional distress damages, but she also found the existence of mitigating factors, such as the fact that H relied on her own testimony to support her emotional distress claim, which was largely but not completely uncorroborated, and such as the facts that H did not seek medical or psychological help, miss work, move from the condominium, or suffer an inability to eat or sleep.

The commission did not contest any of the referee's factual findings with respect to the first *Harrison* factor, which were entitled to substantial deference, but, instead, claimed that the referee did not adequately or appropriately weigh various objective factors, the commission could not prevail on that claim because the referee correctly recognized that the subjective factors were paramount and properly considered determinants that were directly relevant to assessing subjective emotional distress, and, on the basis of those considerations and the referee's own observations, the referee found that H's subjective emotional distress, although serious, was not so severe or disabling as to warrant an award in the range sought by the commission.

Moreover, to the extent that the commission's arguments constituted a critique of the *Harrison* three factor test, this court declined to reexamine it in light of the unique procedural posture of the case, in which opposing viewpoints had not been represented, and insofar as the parties did not ask this court to reject the *Harrison* test.

(<em>One justice dissenting</em>)

Argued December 21, 2022—officially released June 27, 2023

<em>Procedural History</em>

Appeal from the decision of a human rights referee for the defendant Commission on Human Rights and Opportunities, inter alia, declining to increase the amount of damages awarded to the defendant Kelly Howard in an action alleging housing discrimination against the named defendant, brought to the Superior Court in the

judicial district of New Britain, where the court, *Cordani, J.*, rendered judgment dismissing the appeal, from which the plaintiff appealed to the Appellate Court, *Alvord, Alexander* and *Vertefeuille, Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Michael E. Roberts*, human rights attorney, for the appellant (plaintiff).

*Anna-Marie Puryear*, human rights attorney, for the appellee (defendant Commission on Human Rights and Opportunities).

*William Tong*, attorney general, *Michael Skold*, deputy solicitor general, and *Colleen B. Valentine* and *Matthew F. Larock*, assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Opinion*

MULLINS, J. The facts of this case are deeply disturbing. For years, the named defendant, Richard Cantillon, tormented his neighbor, the complainant, Kelly Howard, repeatedly making obscene gestures and calling her the most vile racial epithets, including use of the N-word, when she attempted to access public areas of the condominium complex where they both resided.[1] Cantillon also physically menaced the complainant. He threatened to shoot her and punch her in the face, and he brandished a snow shovel on one occasion. These various incidents resulted in as many as thirty calls to the police. In response to this treatment, the complainant filed a neighbor versus neighbor claim with the Commission on Human Rights and Opportunities, alleging housing discrimination, in that Cantillon had violated her civil rights on the basis of her race.[2]

Cantillon failed to appear for the administrative hearing on the complainant's claims. Consequently, he was defaulted. Then, after a hearing in damages, the presiding human rights referee found that the complainant had suffered emotional distress and awarded her $15,000 in damages, in addition to costs and postjudgment interest.

The commission itself, viewing the award as too low in light of the pervasive scope and nature of Cantillon's discriminatory conduct, appealed to the Superior Court, challenging the amount of the award. Specifically, the commission argued that (1) under *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 708, 41 A.3d 1013 (2012), an award for garden-variety emotional distress damages[3] presumptively must be at least $30,000, and (2) the referee made various errors of law in assessing the heinousness of Cantillon's conduct pursuant to the test espoused in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, Docket No. 7930433 (C.H.R.O. June 3, 1985) (*Harrison*). Neither the complainant nor Cantillon participated in the appeal, however, and, for arcane reasons that are set forth in the decision of the Appellate Court; see *Commission on Human Rights & Opportunities* v. *Cantillon*, 207 Conn. App. 668, 670 n.1, 263 A.3d 887 (2021); the commission operated as both the appellant and the appellee in its appeal before the Superior Court. In doing so, the commission, as plaintiff, and the commission, as defendant, both challenged the referee's award as insufficient.[4]

Even though no party to the appeal defended the decision of the referee or argued in support of Cantillon's likely position that the award was not impermissibly low, the trial court, recognizing that it was bound by the highly deferential standard of review that governs administrative decisions; see General Statutes § 4-183 (j); concluded that there was no legal basis for it to second-guess the award and rendered judgment dis-

missing the appeal. For similar reasons, and with the parties similarly situated, the Appellate Court affirmed the judgment of the Superior Court. See *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 670–71, 686. This certified appeal followed.[5]

Like the courts below, we are compelled to affirm. If some minimum award for garden-variety emotional distress damages is to be established for such heinous conduct, then that minimum amount must be established by the legislature, either independently, via legislation, or in conjunction with the commission, through the Uniform Administrative Procedure Act's rule-making process; see General Statutes § 4-168 et seq.; and not on an ad hoc basis by this court.

We presume the reader's familiarity with the well reasoned opinion of the Appellate Court. That court did an admirable job of setting forth the relevant facts and procedural history, describing the controlling standard of review, summarizing the commission's arguments as to the alleged flaws in the decision of the referee, and explaining why those arguments ultimately were not persuasive. Specifically, the Appellate Court did not read *Patino* to adopt any presumptive floor for emotional distress damages; see *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 673–79; and it concluded that the referee's heavily fact specific assessment of the complainant's emotional distress damages was not an abuse of discretion. See id., 679–86. We agree with that court's resolution of the commission's claims, and no useful purpose would be served by retracing those steps here. We take this opportunity, however, to clarify and elaborate on a few points raised by the commission.

I

The commission's primary argument is that the award violated the law of Connecticut, as purportedly set forth in *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679. Specifically, the commission claims that our decision in *Patino* set a range for garden-variety emotional distress claims of between $30,000 and $125,000. See id., 708. We disagree.

*Patino* involved an employment discrimination action in which the jury awarded the plaintiff $94,500 in noneconomic damages for garden-variety emotional distress. See id., 682, 686. The defendant employer appealed from the trial court's denial of its posttrial motion for remittitur, contending that the $94,500 damages award was tantamount to punitive damages, as it was so excessive as to shock the conscience. Id., 705. In rejecting that claim, we emphasized that, "[b]ecause an award of damages is a matter peculiarly within the province of the trier of facts," a reviewing court should exercise its authority to order remittitur only when "the size of

the verdict so shocks the sense of justice as to compel the conclusion that the [trier was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) Id., 705–706. That exacting standard was not satisfied in *Patino*, we concluded, because there was evidence that the plaintiff had suffered severe, prolonged discrimination and that the defendant had continually failed to remedy the situation. Id., 707–708. In response to the defendant's argument that a trial judge in a similar case had ordered a remittitur; see id., 708 n.26; we cited to a series of cases in which verdicts of $100,000 or more had been awarded in civil rights cases. Id., 708. Following that string citation, we wrote: "see also *Olsen* v. *Nassau*, [615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)] ('[garden-variety] emotional distress claims generally merit $30,000 to $125,000 awards' . . .)." *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 708.

The commission finds much meaning in this brief parenthetical. Specifically, the commission reads our citation to *Olsen* to mean that (1) when awarding damages, a referee must benchmark a case not only to other decisions of the commission, or even to jury verdicts in Connecticut state courts, but also to jury verdicts awarded in the federal courts of neighboring states, (2) a failure to do so would create inequities and inconsistencies and encourage forum shopping, and (3) our referencing of the $30,000 to $125,000 range was meant not just to be descriptive of typical jury verdicts but to establish a soft floor, that is, a norm or rule as to the minimum award that will be deemed presumptively valid.

After a thorough review of our decision in *Patino*, the Appellate Court concluded that "the holding pertaining to the damage[s] award was limited and based on the particular factual circumstances of that case"; *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 676; and that, "[a]lthough perhaps instructive, these cursory references to a range of damages in other cases do not . . . [stand] for any binding principle pertaining to damage[s] awards in emotional distress actions." (Emphasis omitted.) Id., 677. We agree.

Our point in *Patino* was simply that an award of damages that was squarely within the range of those that often are awarded in this part of the country will not shock the judicial conscience. We were not called on, nor did we intend, to use a range of damages referenced in a string citation parenthetical to establish the inverse rule, namely, that an award *lower* than the generally prevailing range of damages awarded in federal jury trials is presumptively an abuse of discretion in Connecticut. And surely we did not intend to constrain an executive agency that was created and directed by the legislature to provide a prompt remedy.

Beyond the analysis offered by the Appellate Court,

we would emphasize four additional points so as to resolve any confusion that *Patino* may have engendered. First, the quote from *Olsen*, that "[garden-variety] emotional distress claims generally merit \$30,000 to \$125,000 awards," is misleading if not understood in context. (Internal quotation marks omitted.) *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46. Although the "\$30,000 to \$125,000" quote has received much attention, both *Olsen* and its progeny acknowledged that the range of awards in the Second Circuit is actually much wider. In fact, in *Olsen* itself, the court acknowledged that, in *Quinby* v. *WestLB AG*, Docket No. 04 Civ. 7406 (WHP), 2008 WL 3826695 (S.D.N.Y. August 15, 2008), the case from which *Olsen* borrowed the "\$30,000 to \$125,000" language; id., *3; the court authorized a \$300,000 award for garden-variety emotional distress damages that, it concluded, was "at or above the upper range of reasonableness . . . ." (Citations omitted; internal quotation marks omitted.) *Olsen* v. *Nassau*, supra, 46, quoting *Quinby* v. *WestLB AG*, supra, *4.

Other cases decided in the Second Circuit over the past decade or so have remitted such damages to, or approved awards of, well below \$30,000.[6] Indeed, just last year, in *Fontana* v. *Bowls & Salads Mexican Grill, Inc.*, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 2389298 (E.D.N.Y. July 1, 2022), the court approved an award of \$15,000 in damages for garden-variety emotional distress in an employment discrimination case. Id., *1–2.

More recent assessments, therefore, have placed a much lower floor on the prevailing range of awards than did *Olsen*. See, e.g., *Fontana* v. *Bowls & Salads Mexican Grill, Inc.*, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 3362181, *6 (E.D.N.Y. February 3, 2022) ("[f]or garden-variety emotional distress claims, courts in the Second Circuit have awarded damages ranging from \$5,000 to \$125,000") (report and recommendation adopted, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 2389298 (E.D.N.Y. July 1, 2022)); *Manson* v. *Friedberg*, Docket No. 08 Civ. 3890 (RO), 2013 WL 2896971, *7 (S.D.N.Y. June 13, 2013) ("[f]or typical or [garden-variety] emotional distress claims, district courts have awarded damages ranging from \$5,000 to \$35,000" (internal quotation marks omitted)). *Olsen*'s range, then, is hardly a rule.[7]

Second, for this court to confine emotional distress damages to some permissible range by judicial fiat would run afoul of decades of Connecticut jurisprudence. Noneconomic damages, such as emotional distress, pain and suffering, are, "at best, rather indefinite and speculative in nature." *McKirdy* v. *Cascio*, 142 Conn. 80, 84, 111 A.2d 555 (1955). For more than fifty years, this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate

award of noneconomic damages.

As we explained in *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 882 A.2d 653 (2005), in the closely related context of a motion for remittitur, "[t]he law . . . is well settled. The amount of a damage[s] award is a matter peculiarly within the province of the trier of fact . . . . The size of the verdict alone does not determine whether it is excessive. *The only practical test* to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the [trier of fact] was influenced by partiality, prejudice, mistake or corruption." (Emphasis added; internal quotation marks omitted.) Id., 783; see also, e.g., *Munn* v. *Hotchkiss School*, 326 Conn. 540, 577, 165 A.3d 1167 (2017) ("[Emotional distress damages and related] damages lie in an extremely uncertain area . . . in which it is quite impossible to assign values with any precision . . . . [N]o formulaic process of review applies . . . ." (Citation omitted; internal quotation marks omitted.)); *Wichers* v. *Hatch*, 252 Conn. 174, 181, 745 A.2d 789 (2000) (attempt by this court "to establish an arbitrary demarcation" for calculating noneconomic damages award would be "both unnecessary and unwise"); *Birgel* v. *Heintz*, 163 Conn. 23, 34, 301 A.2d 249 (1972) ("[p]roper compensation for personal injuries cannot be computed by mathematical formula, and the law furnishes no precise rule for [such an] assessment" (internal quotation marks omitted)).

Consistent with our repeated rejection of any "practical test" or "mathematical formula" for both additur and remittitur, this court long has been of the view that benchmarking a challenged award against awards in other cases is not required or even, necessarily, appropriate, holding that "comparisons with amounts in other verdicts serve little purpose." *Gorham* v. *Farmington Motor Inn, Inc.*, 159 Conn. 576, 585, 271 A.2d 94 (1970), citing *Fairbanks* v. *State*, 143 Conn. 653, 661, 124 A.2d 893 (1956).

Most recently, in *Munn* v. *Hotchkiss School*, supra, 326 Conn. 540, in the context of a motion to remit a substantial award of more than $30 million in noneconomic damages; see id., 543, 569; we declined the defendant's invitation "to examine the verdicts returned by other juries in other cases and to engage in an exercise of comparing which plaintiff's injuries are worse." Id., 578. We reiterated that "[n]o one life is like any other, and the damages for the destruction of one furnish no fixed standard for others. . . . Consequently, [i]*t serves no useful purpose to compare a verdict in one personal injury case with the verdicts in other personal injury cases.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id.; see also, e.g., *Welsh* v. *Martinez*, 157 Conn. App. 223, 242, 114 A.3d 1231 ("[a]s

our Supreme Court has explained, [c]omparison of verdicts is of little value" (internal quotation marks omitted)), cert. denied, 317 Conn. 922, 118 A.3d 63 (2015).[8]

The rationales that underlie these rules counsel perhaps most strongly against establishing a legal floor for garden-variety emotional distress damages. It is well established that everyday hurt feelings and affronts can, as a matter of fact or law, be insufficient as to be legally actionable; see, e.g., *Appleton* v. *Board of Education*, 254 Conn. 205, 211, 757 A.2d 1059 (2000); and that, even when a compensable injury has been proven, an award of no more than nominal emotional distress damages is permissible. See, e.g., *Richey* v. *Main Street Stafford, LLC*, 110 Conn. App. 209, 224–25, 954 A.2d 889 (2008). It would be an odd rule indeed if we were to hold, on the one hand, that it is permissible to award only a few dollars in the many cases in which the plaintiff's distress falls somewhere within the ordinary range of emotional harms endured in the course of any human life but then to hold, on the other hand, that, when more than nominal damages *are* awarded, the award must be $30,000 or more. Surely, across the broad spectrum of purely emotional human anguish, one can imagine an injury warranting a $15,000 award. Whether *this* was *that* injury, under the circumstances of this case, was a question for the referee. Notwithstanding our own view that this case certainly may have merited a more substantial award, pursuant to our standard of review, namely, to decide only whether, in light of the evidence, the referee has acted unreasonably, arbitrarily, illegally, or in abuse of her discretion; see, e.g., *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 318, 258 A.3d 1 (2021); we cannot conclude that the referee committed reversible error.

That brings us to the third point. The commission has not identified any other area of the law in which the courts of this state have taken the extraordinary step of establishing a limit—upward or downward—on the amount of damages that presumptively can be awarded by a Connecticut jury, court, or administrative agency. And for good reason. Public sentiments regarding the range of damages that is fair and fitting in different types of legal actions can vary widely and evolve rapidly. See, e.g., *Wochek* v. *Foley*, 193 Conn. 582, 586, 477 A.2d 1015 (1984) ("[t]he question of damages in personal injury cases, especially in these times of changing values, is always a difficult one" (internal quotation marks omitted)). For that reason, determining whether to establish some minimum or maximum permissible award for any particular cause of action, in light of evolving public sentiments and the conflicting societal interests involved, is a quintessentially legislative, rather than judicial, function, especially when that determination involves an executive agency. See, e.g., *Jarmie* v. *Troncale*, 306 Conn. 578, 624–25, 50 A.3d 802 (2012) (tort reform is proper domain of legislature); *Jones* v. *Karraker*, 98 Ill.

2d 487, 492, 457 N.E.2d 23 (1983) ("In our opinion placing a limit on the maximum or minimum amount of an award . . . is a legislative prerogative. We decline to do so."). In Connecticut, our legislature has exercised that prerogative on multiple occasions, establishing minimum[9] and maximum[10] damages of various sorts across a range of actions. It has not done so here.

Fourth, we are not persuaded by the commission's argument that, if we decline to set a floor for emotional distress damages awards consistent with the lower end of the prevailing range of awards in the Second Circuit, then there will be a forum shopping problem. The concern, it seems, is that complainants may choose to file an action in a federal district court, where they can be assured of a recovery of at least $30,000, rather than to file a claim with the commission.

Although forum shopping can be a problem in certain contexts; see, e.g., *Adams* v. *Aircraft Spruce & Specialty Co.*, 345 Conn. 312, 348, 284 A.3d 600 (2022) (discussing concerns regarding forum shopping by nonresident plaintiffs); one must be careful not to overstate the concern. See, e.g., *New London County Mutual Ins. Co.* v. *Nantes*, 303 Conn. 737, 750–51, 36 A.3d 224 (2012). In the present case, the commission has presented no evidence that complainants have in fact been engaging in forum shopping of this sort, and there are many reasons why we believe that the concerns expressed by the commission are overstated. As we discussed, *Olsen* appears to have overstated the floor for garden-variety emotional distress damages in the Second Circuit. One need not look far to find recent federal cases in Connecticut in which emotional distress damages of less than $30,000 were awarded.[11]

We note that, even if federal jury awards were in the range that *Olsen* indicated, there are many differences between pursuing an administrative complaint before the commission and litigating a civil action in federal court—everything from different statutes of limitations and institutional support for injured parties to alacrity and mandatory mediation—that might make one venue or the other more advantageous for a particular complainant. Accordingly, we do not see a serious forum shopping problem here.

II

The second principal argument raised by the commission is that the referee, in fashioning the damages award, incorrectly applied and expanded the so-called "*Harrison* factors." In *Harrison*, the commission adopted a three factor test to be applied when calculating emotional distress damages. See *Commission on human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, Docket No. 7930433, pp. 7–8. "Under the *Harrison* analysis, the [first and] most important factor [in calculating emotional distress] damages is the sub-

jective internal emotional reaction of the complainants to the discriminatory experience [that] they have undergone and whether the reaction was intense, prolonged and understandable. . . . [The second factor] . . . is whether the discrimination occurred in front of other people. . . . For this, the [referee] must consider [whether] the discriminatory act was [performed] in public and in view or earshot of other persons which would cause a more intense feeling of humiliation and embarrassment. . . . The third and final factor is the degree of the offensiveness of the discrimination and the impact on the complainant. . . . In other words, was the act egregious and was it done with the intention and effect of producing the maximum pain, embarrassment and humiliation." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, 213 Conn. App. 635, 653, 278 A.3d 607, cert. denied, 345 Conn. 962, 285 A.3d 389 (2022); see also *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, pp. 7–8. In the present case, the commission contends that the referee erred by, among other things, considering factors other than those highlighted in the test, such as the fact that Cantillon did not hold a position of power over the complainant, and misconstruing the second factor, namely, public humiliation.

We agree with the Appellate Court that the referee invoked the applicable legal standard, that her application of that standard did not represent an abuse of discretion, and that her factual findings were not clearly erroneous. See *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 681–86.

*Harrison* recognizes that the subjective factors—the emotional and psychological impacts of the discriminatory conduct on the complainant—will always be the most important because what we ultimately are assessing is the degree of actual emotional distress suffered. The parties do not contend otherwise. The referee recognized this principle, observing, at the outset, that the complainant's "internal subjective emotional reaction to [Cantillon's] racially motivated harassment is the key element and the most important consideration."

Although the referee found that this element was satisfied, so as to warrant some award of emotional distress damages, she also repeatedly emphasized what she found to be various limiting or mitigating factors. First, the complainant relied on her own testimony to support her emotional distress claim, which was largely, though not completely, uncorroborated by relatives, friends, or associates. Second, the emotional distress was not enough to cause the complainant to seek medical or psychological help; nor did it cause her to miss any work or compel her to move from her condominium. Third, the distress did not rise to a level at which

it interfered with her ability to sleep or eat. Indeed, there was no evidence of any recognized symptoms of severe emotional distress, such as "depression, mental anxiety, panic attacks, isolation, sleeplessness, weight loss, or increased [alcohol consumption] . . . ." From those facts, the referee determined that "there is no indication from the evidence presented that any emotional damage[s] suffered by the complainant [were] severe or had long-term implications or ramifications."

The commission does not contest any of those factual findings. Rather, the commission's primary challenge is that the referee did not adequately or appropriately weigh various objective factors. Specifically, the commission contends that the referee afforded insufficient weight to the unique heinousness of the N-word, the fact that Cantillon's abuse of the complainant did not occur entirely out of the public view,[12] and the secretive nature of Cantillon's conduct, but that the referee gave too much weight to the fact that Cantillon was merely a neighbor. But, as we stated, although these objective considerations are relevant to a referee's assessment of emotional damages, they are secondary to the subjective factors. The referee correctly recognized that the subjective factors are paramount, she considered determinants that are directly relevant to assessing subjective emotional distress, and, on the basis of those considerations and her own observations, she found, as a factual matter, that the complainant's subjective emotional distress, although serious, was not so severe or disabling as to warrant an award in the range sought by the commission.[13] Her factual findings in that regard are entitled to substantial deference. Although we might have assessed the complainant's condition differently, and although we certainly have some questions regarding the weight that the referee afforded to some of the secondary, objective factors, her conclusions were not arbitrary, illegal, or an abuse of discretion, which would be required to overturn them.[14]

We have one final observation. We understand that some of the commission's arguments could be construed as a critique of the *Harrison* test itself. The commission, for example, appears to take issue with the fact that the second *Harrison* factor assumes that public discrimination, which may be particularly embarrassing or humiliating, is necessarily more egregious than private, physically threatening discrimination, which may be more terrifying.

We are sympathetic to the commission's argument that, although the subjective factors will always be the most important, a host of more objective factors also may assist a referee in the difficult task of assessing another individual's internal psychological state, based on our shared understanding of what sorts of experiences tend to be the most traumatic and distressing. Those objective factors may include those emphasized

by the commission—the heinous nature of the language involved, the insidious, secretive character of the discrimination, and the fact that the verbal abuse was paired with physical threats—as well as many other factors. For these and other reasons, we are not entirely convinced that the *Harrison* test represents a reasonable framework for assessing emotional distress damages.

The parties have not asked us to reject the *Harrison* three factor test, however. Given the unique procedural posture of this case, in which opposing viewpoints have not been represented, this is not the case in which to do so. Therefore, we save for another day the question of whether we should reexamine the *Harrison* framework.

We cannot overstate the vileness of Cantillon's language and his ongoing campaign to terrorize the complainant and, at times, her daughter and her former boyfriend, on the basis of their race. He should not be rewarded for the complainant's admirable resilience in the face of malice. We have little doubt that Cantillon's heinous conduct reasonably could have resulted in a damages award many times higher. But the referee, as the finder of fact, was in the best position to assess the necessarily uncertain nature and degree of the complainant's internal distress, and it would not be proper for us to substitute our own judgment for those factual determinations. See, e.g., *Meriden* v. *Freedom of Information Commission*, supra, 338 Conn. 318.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and D'AURIA, Js., concurred.

[1] By way of example, Cantillon called the complainant a "nigger" as many as five times per week, he told her that "[n]iggers don't belong here," and he warned her, "I'm . . . going to get you nigger." He also called her former boyfriend a "nigger," and he went so far as to call her daughter a "fat, Black nigger."

[2] Specifically, the complainant alleged that Cantillon had engaged in discriminatory housing practices in violation of General Statutes § 46a-64c and the federal Fair Housing Act, 42 U.S.C. 3601 et seq., as applied via General Statutes § 46a-58 (a). In its amicus brief in opposition to certain arguments of the commission, the state raises the question of whether a housing discrimination claim is cognizable against a neighbor under either the federal or the state fair housing law. Because Cantillon is not present to argue that a claim may not be brought against a neighbor, in accordance with state and federal fair housing law, we assume, without deciding, that such a claim will lie under at least some circumstances.

[3] The term "garden-variety" is a bit of a misnomer, in that it seems to disparage these types of claims, when, in reality, it merely refers to mental suffering that is established primarily through the testimony of a plaintiff or a complainant and not through expert medical or psychological evidence. See, e.g., *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 707; see also, e.g., *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 127–28 n.25, 272 A.3d 603 (2022) (discussing definition of garden-variety emotional distress). That said, a claim of mental suffering that is supported only by the testimony of that individual may be more difficult for the trier of fact to assess than one that is corroborated by expert testimony.

[4] General Statutes § 46a-94a (a) authorizes the commission (as plaintiff) to appeal to the Superior Court an adverse decision of a presiding officer, but the commission (as defendant) understands itself to be prevented from defending the decision of the officer because it owes a continuing obligation to the complainant. As a result, the defendant commission filed its brief

arguing essentially the same position as the plaintiff commission. The complainant is also a defendant, although she has not participated in the appeal.

In the interest of simplicity, we refer to the plaintiff commission and the defendant commission collectively as the commission, except when it is necessary to identify one of those parties individually.

[5] We granted the plaintiff commission's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had properly determined that the . . . referee adjudicating the underlying housing discrimination claim applied the proper legal principles in awarding the claimant 'garden-variety' damages for emotional distress in the amount of $15,000 against [Cantillon], a neighbor who repeatedly subjected the claimant to racially motivated verbal and physical harassment?" *Commission on Human Rights & Opportunities* v. *Cantillon*, 340 Conn. 909, 909–10, 264 A.3d 94 (2021).

[6] See, e.g., *Lore* v. *Syracuse*, 670 F.3d 127, 177 ("New York cases vary widely in the amount of damages awarded for mental anguish. Many do reduce awards to $30,000 or below." (Internal quotation marks omitted.)), modified, 460 Fed. Appx. 73 (2d Cir. 2012); *MacMillan* v. *Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 550–51, 561, 563 (S.D.N.Y. 2012) (holding, in employment discrimination case, that motion for new trial concerning compensatory damages would be granted unless plaintiff agreed to remittitur reducing amount of compensatory damages, observing that, "[when] a plaintiff offers only sparse evidence of emotional distress . . . courts have reduced such awards to as little as $10,000," and concluding that "an award of $30,000 constitutes the maximum that [can] be upheld . . . as not excessive" (internal quotation marks omitted)); *Charvenko* v. *Barbera*, Docket No. 09-CV-6383T, 2011 WL 1672471, *6–8 (W.D.N.Y. March 30, 2011) (awarding $1000 in emotional distress damages in connection with default judgment in housing discrimination claim, and reviewing case law supporting comparably low awards when testimony of distress is largely conclusory or limited to describing feelings of humiliation) (report and recommendation adopted, Docket No. 09-CV-6383T, 2011 WL 1659882 (W.D.N.Y. May 3, 2011)); see also, e.g., *Borja-Fierro* v. *Girozentrale Vienna Bank*, Docket No. 91 Civ. 8743 (CMM), 1994 WL 240360, *4 (S.D.N.Y. May 27, 1994) ("in the vast majority of cases [involving similarly vague and conclusory testimony regarding mental anguish], courts found awards of $5,000 to $10,000 to be appropriate").

[7] It bears emphasizing that all of these federal cases were decided in the context of motions for remittitur, rather than for additur. "[T]he Supreme Court of the United States has declared, as a matter of federal law, that any additur violates the right to a jury trial that is guaranteed by the seventh amendment to the United States constitution." (Emphasis omitted.) *Turner* v. *Pascarelli*, 88 Conn. App. 720, 723, 871 A.2d 1044 (2005).

[8] Although this has remained the prevailing view, as exemplified by our recent decision in *Munn* v. *Hotchkiss School*, supra, 326 Conn. 540, in a few older cases, this court suggested that cases from other jurisdictions, although not determinative, may offer some guidance in determining a fair and reasonable range of damages. See, e.g., *Wochek* v. *Foley*, 193 Conn. 582, 587, 477 A.2d 1015 (1984); *Gorczyca* v. *New York, New Haven & Hartford Railroad Co.*, 141 Conn. 701, 705, 109 A.2d 589 (1954).

[9] See, e.g., General Statutes § 42-251 (b) (establishing minimum damages award of $250 for violation of rent-to-own agreement laws); General Statutes § 54-41r (establishing minimum compensatory damages award of $1000 for tampering with contents of private communications and for illegal wiretapping and electronic surveillance).

[10] See, e.g., General Statutes § 35-53 (b) (capping punitive damages in wilful and malicious misappropriation actions); General Statutes § 46a-89 (b) (2) (C) (same, discriminatory housing and public accommodations practices actions); General Statutes § 46a-98 (c) and (d) (same, discriminatory credit practice actions); General Statutes § 52-240b (same, product liability actions); and General Statutes § 52-564a (c) (capping civil damages that may be awarded to property owner in shoplifting action).

[11] See, e.g., *Champagne* v. *Columbia Dental, P.C.*, Docket No. 3:18-cv-01390 (VLB), 2022 WL 951687, *1 (D. Conn. March 30, 2022) ($10,000 for sexual harassment and discrimination); *Brown* v. *B&D Land Clearing & Logging, LLC*, Docket No. 3:17-CV-01413 (KAD), 2020 WL 13248680, *4 (D. Conn. March 3, 2020) ($10,000 for wrongful termination).

[12] Consistent with the testimony, the referee found that, although Cantillon had directed racially disparaging slurs and obscene gestures at the complainant primarily when the two were alone and there were no witnesses to

observe the harassment, witnesses did observe two such incidents, as well as Cantillon's threat, at a public meeting, to punch the complainant in the face. The commission argues that, rather than emphasizing the largely private nature of the harassment, the referee should have simply deemed the second *Harrison* factor satisfied on the basis of the handful of public incidents.

[13] The defendant commission concedes that "this is not a case [in which the complainant] felt embarrassed or humiliated . . . ."

[14] We have considered the plaintiff commission's other arguments, and, to the extent that the Appellate Court did not directly dispose of them, we conclude that they are without merit.